**ARNOLD & PORTER KAYE SCHOLER LLP**
S. Zachary Fayne (SBN 307288)
zachary.fayne@arnoldporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:  415.471.3100
Facsimile:   415.471.3400

Attorneys for Plaintiff
HONEYWELL INTERNATIONAL INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>CALMAT CO. d/b/a VULCAN MATERIALS COMPANY, WESTERN DIVISION, a Delaware Corporation; LOS ANGELES BY-PRODUCTS COMPANY, a California Corporation,<br><br>Defendants. | Civil Action No. 8:23-cv-385<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff Honeywell International Inc. ("Honeywell" or "Plaintiff"), by and through its undersigned counsel, alleges as follows:

### PRELIMINARY STATEMENT

1. Honeywell brings this civil action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq*. ("CERCLA"), and California state law for costs incurred and to be incurred as a result of releases of hazardous substances at the North Hollywood Operable Unit ("NHOU") of the San Fernando Valley Area 1 Superfund Site by Defendants CalMat Co., d/b/a Vulcan Materials Company, Western Division ("CalMat"), Los Angeles By-Products Company ("LABP"), and/or their predecessors (collectively, "Defendants").

2. To date, Honeywell has incurred more than $40 million in necessary costs to remediate groundwater contamination at the NHOU, consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300 *et seq*.  Honeywell estimates that its total response costs to construct and operate the remedy will exceed $100 million.

3. Honeywell also has incurred more than $11 million in costs to resolve its liability to the United States for certain of the U.S. Environmental Protection Agency's ("EPA's") past costs to investigate and oversee remediation of the NHOU.

4. Defendants have caused or contributed to environmental contamination at the NHOU.  To ensure the successful remediation of the NHOU, Honeywell seeks to recover from Defendants their equitable shares of necessary response costs.

5. Honeywell therefore brings this action under CERCLA §§ 107(a) and 113(f), California Health & Safety Code §§ 25300 *et seq*., and state common law for recovery of Defendants' equitable shares of past response costs to construct and operate the remedy at the NHOU and a declaratory judgment on liability for future response costs to construct and operate the remedy at the NHOU.

### JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to sections 113(b) and 113(g)(3) of CERCLA, 42 U.S.C. §§ 9613(b), (g)(3), and 28

U.S.C. §§ 1331, 1367.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for claims based upon California state law that arise out of a common nucleus of operative facts shared with the CERCLA claims.

8. This Court has jurisdiction to enter a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, as well as section 113 of CERCLA, 42 U.S.C. § 9613.

9. Venue is proper in the Central District of California under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b), because the releases and/or threatened releases of hazardous substances that give rise to this action occurred or will occur in this District.

**PARTIES**

10. Plaintiff Honeywell is a Delaware corporation with its headquarters in Charlotte, North Carolina. Honeywell produces a variety of commercial and consumer products, engineering services, and aerospace systems for a wide variety of customers.

11. Honeywell is a successor-in-interest to AlliedSignal, Inc. AlliedSignal, Inc. is a former owner of the North Hollywood Bendix facility, located at 11510-11600, 11620, and 1168 Sherman Way, North Hollywood, California 91605 (the "Facility"). From 1941 to 1983, the Facility was owned and operated by the Bendix Corporation. In 1983, Allied Corporation acquired Bendix Corporation. In 1985, Allied Corporation combined with Signal Companies to eventually form AlliedSignal, Inc. In 1999, AlliedSignal, Inc. merged with Honeywell.

12. Defendant CalMat is a corporation organized and existing under the laws of Delaware and has its principal place of business in the State of Alabama. CalMat is a successor-in-interest to Conrock Co. and Consolidated Rock Products Co. (collectively, "Conrock").

13. Defendant Los Angeles By-Products Company ("LABP") is a corporation organized and existing under the laws of California and having its principal place of business in the State of California.

SECOND AMENDED COMPLAINT

# FACTUAL ALLEGATIONS

## I.    The North Hollywood Operable Unit

14.    The North Hollywood Operable Unit ("NHOU") is part of the San Fernando Valley (Area 1) Superfund Site ("SFV Area 1 Superfund Site").

15.    The SFV Area 1 Superfund Site is a 20-square-mile area of contaminated groundwater located primarily in North Hollywood and Burbank, California.  It is one of four Superfund sites in the San Fernando Valley.

16.    EPA placed the SFV Area 1 Superfund Site on the National Priorities List on June 10, 1986 by publication in the Federal Register.  *See* 51 Fed. Reg. 21,054 (June 10, 1986).  The National Priorities List is intended primarily to guide EPA in determining which sites of releases or threatened releases of hazardous substances warrant further investigation.

17.    EPA has divided the SFV Area 1 Superfund Site into two operable units: the Burbank Operable Unit, located primarily in Burbank and south of the Burbank airport; and the NHOU, located to the west of the Burbank Operable Unit.

18.    The NHOU consists of approximately four square miles of groundwater contaminated with hazardous substances underlying an area of mixed industrial, commercial, and residential land use in North Hollywood, and includes any areas to which and from which such hazardous substance groundwater contamination migrates.

19.    As depicted in Figure 1 below, the NHOU is located 15 miles north of downtown Los Angeles and immediately west of the City of Burbank.  It is bordered by Interstate 5 to the north, State Highway 170 and Lankershim Boulevard to the west, the Burbank Airport to the east, and Burbank Boulevard to the south.

SECOND AMENDED COMPLAINT

**Figure 1**



20. From the 1920s through the 1950s, the area near and upgradient of the NHOU experienced rapid growth in industrial manufacturing. Honeywell's predecessors, including the Bendix Corporation and the Allied Corporation, conducted manufacturing operations for the aerospace industry in this area.

21. Defendants owned and/or operated multiple unlined landfills in the areas near and upgradient of the NHOU, including Hewitt Pit, Tuxford Pit, and Penrose Pit Landfills. LABP also operated one lined landfill in the NHOU, the Strathern Pit Landfill.

22. Figure 2 below shows the locations of the Hewitt Pit, Penrose Pit, Tuxford Pit, and Strathern Pit Landfills in relation to the SFV Area 1 Superfund Site and certain extraction wells that have been installed as part of the NHOU investigation and remediation efforts.

**Figure 2**



## II.    Detection and Remediation of Groundwater Contamination at the NHOU

23.    In the early 1980s, testing to determine the presence of certain industrial chemicals in drinking water revealed the presence of volatile organic compounds ("VOCs") in the San Fernando Valley Basin's ("Basin's") groundwater.

24.    In 1985, sampling and analysis of groundwater from production wells in the NHOU well field revealed elevated levels of VOCs, including trichloroethylene ("TCE") and tetrachloroethylene ("PCE").

25.    As addressed above, in 1986, EPA placed the SFV Area 1 Superfund Site, including the NHOU, on the National Priorities List.

### A.    The First Interim Remedy

26.    In September 1987, EPA signed a Record of Decision for the remediation of VOC-contaminated groundwater at the NHOU (the "1987 ROD").  The 1987 ROD called for 15 years of extraction and treatment of VOC-contaminated groundwater as an interim containment remedy (the "First Interim Remedy").

27.    The First Interim Remedy was constructed in 1989 by the Los Angeles

- 5 -
SECOND AMENDED COMPLAINT

Department of Water and Power ("LADWP") to operate in conjunction with LADWP's North Hollywood municipal water treatment and distribution plant.

28. Since its startup, the First Interim Remedy was operated by LADWP pursuant to a series of cooperative agreements with EPA and the State of California, and with financial support from EPA and the State of California.

29. On July 16, 1993, EPA sent General Notice Letters to CalMat, LABP, AlliedSignal, Inc., and Lockheed Corporation, among others, designating these entities as potentially responsible parties ("PRPs") for groundwater contamination at the NHOU pursuant to sections 106(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9606(a), 9607(a).

30. In 1996 and 1997, the United States and the State of California entered into partial consent decrees with 37 PRPs, including AlliedSignal, Inc., Lockheed Martin Corporation (the successor to Lockheed Corporation), CalMat, and LABP, among others, to resolve the settling defendants' liability for response costs incurred in connection with the First Interim Remedy. Specifically, the settling defendants agreed to (1) reimburse the United States and the State of California for past costs incurred in connection with the 1987 ROD and a proportional share of past Basin-wide costs, and (2) pay future costs to operate and maintain the First Interim Remedy for the remainder of its 15-year term.

31. In the 1996 and 1997 partial consent decrees, the United States and the State of California specifically reserved their rights to institute proceedings to recover further response costs at the NHOU, including costs associated with (i) the performance of any remedial investigation/feasibility study other than the feasibility study that formed the basis for the 1987 ROD; and (ii) additional response actions that may be implemented pursuant to any final remedy or pursuant to any future Explanation of Significant Differences, Record of Decision, or amendment to any Record of Decision.

32. In August 2008, Honeywell, Lockheed Martin Corporation, and CalMat entered into a Settlement Agreement for Recovery of Response Costs with EPA,

pursuant to which they each agreed to provide additional funding for the ongoing operation and maintenance of the First Interim Remedy.

33.    In July 2013 and October 2015, Honeywell and Lockheed Martin Corporation—but not CalMat—entered into amendments to the Settlement Agreement for Recovery of Response Costs, pursuant to which they agreed to provide additional funding for the ongoing operation and maintenance of the First Interim Remedy.

34.    The extraction and treatment system put into place at the NHOU for the First Interim Remedy was shut down in 2017.

35.    Honeywell does not seek to recover in this action its costs incurred in connection with the First Interim Remedy.

**B.    The Second Interim Remedy**

36.    In September 2009, EPA issued a new Record of Decision for the NHOU (the "2009 ROD"), selecting a new interim remedy (the "Second Interim Remedy") for the NHOU.

37.    The Second Interim Remedy selected in the 2009 ROD includes construction of new extraction wells and an above-ground water treatment system, chromium and 1,4-dioxane treatment, expanded VOC treatment, and continued use of the treated water in LADWP's municipal water supply system.

38.    Among others, the remedial action objectives ("RAOs") for the Second Interim Remedy include hydraulic containment of the most contaminated areas of the NHOU groundwater plume "to the maximum extent practicable."

39.    In January 2014, EPA amended the 2009 ROD to add re-injection of the treated water as an alternate end use.

40.    In February 2018, EPA issued an Explanation of Significant Differences ("2018 ESD") modifying the Second Interim Remedy selected in the 2009 ROD.  In the 2018 ESD, EPA determined that the Second Interim Remedy was capable of achieving greater levels of containment in the NHOU and estimated that the Second Interim Remedy broadly could achieve an annual average pumping rate of 6,500

gallons per minute ("gpm"), improving both hydraulic containment and contaminant mass removal. The 2018 ESD contemplated that 4,800 gpm of the 6,500 gpm would be pumped from groundwater extraction wells within the "central" portion of the NHOU ("Central NHOU").

41. On July 1, 2010, EPA issued Special Notice Letters to 21 parties—including Honeywell, Lockheed Martin Corporation, CalMat, and LABP—identifying them as PRPs at the NHOU under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and requesting their participation in upcoming negotiations to implement the Second Interim Remedy. EPA also sought to recover its past response costs associated with the Second Interim Remedy. EPA stated that, as of July 2010, it already had undertaken certain actions and incurred costs of at least $13,015,587 in response to conditions at the NHOU, which includes $2,708,864 in Basin-wide costs attributable to the NHOU. EPA has continued to incur response costs in connection with the NHOU since 2010.

42. As used in this Complaint, the term "Second Interim Remedy" includes, but is not limited to, construction and operation of new and replacement extraction wells, a groundwater treatment system to remove VOCs, 1,4-dioxane, hexavalent chromium, and other contaminants, and conveyances and discharge lines to support the treatment system and for eventual delivery of water to the North Hollywood Sump.

43. The Second Interim Remedy is estimated to cost more than $100 million in capital and operating expenditures to construct and operate.

**C.    Honeywell's Implementation of the Second Interim Remedy**

44. Honeywell has and continues to diligently pursue implementation of the Second Interim Remedy for the Central NHOU, in cooperation with EPA and LADWP.

**1.    Remedial Investigation and Remedial Design Costs**

45. In 2010 and 2011, Honeywell entered into Administrative Settlement Agreements and Orders on Consent ("AOCs") with EPA to investigate the nature and extent of contamination at or from the NHOU and to develop a set of plans and specifications for the design of the Second Interim Remedy at the NHOU.

46.     Honeywell does not seek to recover in this action its costs incurred for remedial investigation and remedial design work in connection with the 2010 and 2011 AOCs.

### 2.     Remedial Action Costs

47.     In October 2017, EPA issued a Unilateral Administrative Order for Remedial Action to Honeywell, effective February 1, 2018 ("2018 UAO").

48.     The 2018 UAO directed Honeywell to construct a portion of the remedy contemplated by the 2009 Second Interim Remedy ROD for the Central NHOU.  The 2018 UAO provided that the remedy to be constructed by Honeywell shall consist of replacement extraction wells and a treatment system capable of removing VOCs, 1,4-dioxane, and hexavalent chromium from the extracted groundwater.  It further required Honeywell to complete startup and shakedown operations for the same.

49.     In July 2019, EPA issued a First Amendment to Unilateral Administrative Order for Remedial Action to Honeywell ("First Amendment to the UAO").  Among other things, the First Amendment to the UAO directed Honeywell to install additional extraction wells identified in the 2018 ESD, as well as the piping infrastructure necessary to convey the water from those wells to a water treatment plant.

50.     In September 2024, Honeywell and other settling defendants entered into a Consent Decree with EPA and the California Department of Toxic Substances Control and the Toxic Substances Control Account ("DTSC") to resolve claims by the United States, on behalf of EPA, and DTSC under sections 106 and 107 of CERCLA and sections 78660 and 79650 of the California Health and Safety Code for, *inter alia*, performance of certain response actions at the NHOU ("2025 Consent Decree).

51.     Pursuant to the 2025 Consent Decree, Honeywell agreed to implement and monitor the effectiveness of the Second Interim Remedy remedial action for the Central NHOU.  The 2025 Consent Decree allows for either reinjection of treated water or the delivery of treated water to LADWP for its use as drinking water supply, consistent with the 2009 ROD and 2018 ESD, with the reinjection end use projected to be the

more expensive alternative.

52.    On February 12, 2025, the U.S. District Court for the Central District of California approved and entered the 2025 Consent Decree, and the 2025 Consent Decree thereby became effective on that date. *See United States et al. v. Honeywell International Inc. et al.*, No. 2:24-cv-08378-MCS-AGR (C.D. Cal.), ECF Nos. 16-17.

53.    Honeywell initiated physical, on-site construction of the Second Interim Remedy for the Central NHOU on February 5, 2018.  Construction is ongoing.

54.    Honeywell has incurred, and will continue to incur, millions of dollars in necessary response costs to construct, operate, and monitor the Second Interim Remedy for the Central NHOU pursuant to the 2018 UAO, the First Amendment to the UAO, and the 2025 Consent Decree, consistent with the NCP and in cooperation with LADWP.

### D.    Honeywell Settlement of Past EPA Costs

55.    On December 4, 2019, Honeywell and EPA entered into a Settlement Agreement for Recovery of Past Response Costs, effective March 5, 2020 (the "2020 EPA Past Cost Settlement Agreement"), pursuant to which Honeywell agreed to pay $11.6 million to resolve its liability to the United States for EPA's past response costs at the NHOU through September 30, 2019, including:  (a) past response costs incurred by EPA in connection with the Second Interim Remedy; (b) past costs that EPA has paid in connection with the Basin-wide remedial investigation in the San Fernando Valley; and (c) EPA oversight costs.

### III.    Defendants Caused or Contributed to Contamination at the NHOU

56.    Defendant CalMat owned and/or operated at least two landfill facilities located near and upgradient of the NHOU:  (1) the Hewitt Pit Landfill; and (2) the Penrose Pit Landfill.

57.    Defendant LABP owned and/or operated at least four landfill facilities located near and upgradient of the NHOU:  (1) the Hewitt Pit Landfill; and (2) the Penrose Pit Landfill; (3) the Tuxford Pit Landfill; and (4) the Strathern Pit Landfill.

SECOND AMENDED COMPLAINT

58. Hazardous substances, including but not limited to PCE, TCE, and 1,4-dioxane, were disposed of at the Hewitt Pit, Penrose Pit, Tuxford Pit, and Strathern Pit Landfills (collectively, the "Landfills") during the period of Defendants' ownership and/or operation of the Landfills.

59. The disposal of hazardous substances at the Landfills during the period of Defendants' ownership and/or operation resulted in the release and/or threatened release of hazardous substances that caused and/or contributed to contamination of soil and groundwater at the NHOU.

60. Honeywell has incurred, and will continue to incur, necessary response costs at the NHOU, consistent with the NCP, to remediate the hazardous substances released or threatened to be released from the Landfills during the period of Defendants' ownership and/or operation.

61. On multiple occasions, EPA has identified Defendants CalMat and LABP as PRPs for environmental contamination at the NHOU pursuant to sections 106(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9606(a), 9607(a).

62. In July 1993, EPA sent General Notice Letters to CalMat and LABP, among others, identifying CalMat and LABP as PRPs for the NHOU.

63. In March and April 2006, respectively, EPA sent General Notice Letters to CalMat and LABP, again identifying Defendants as PRPs for contamination of soils and groundwater at the NHOU under section 107(a) of CERCLA, 42 U.S.C. § 9607(a). EPA explained that Defendants' liability is based on their status as owners or operators of facilities within the NHOU from which contaminants, including but not limited to TCE and PCE, were released into the environment.

64. In July 2010, EPA sent Special Notice Letters to CalMat and LABP, among others, again identifying CalMat and LABP as PRPs for the NHOU.

65. In July 2016, EPA sent CalMat an Update to the Special Notice Letter, again identifying CalMat as a PRP for the NHOU.

SECOND AMENDED COMPLAINT

### A.    The Hewitt Pit Landfill

66.    The Hewitt Pit Landfill is located near and upgradient of the NHOU at 7245-7361 Laurel Canyon Road, North Hollywood, California 91605 (assessor parcel number 2307-022-010).

67.    The Hewitt Pit Landfill was an unlined municipal solid waste landfill that accepted waste from approximately 1963 through approximately 1975.

68.    The Hewitt Pit Landfill is approximately 60 acres in size and was originally a gravel mining pit acquired by CalMat's predecessor, Conrock, in 1923.

69.    Because hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Hewitt Pit Landfill, the Hewitt Pit Landfill is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

### 1.    Source Property Ownership and Operation

70.    CalMat was an owner and operator of the Hewitt Pit Landfill, within the meaning of sections 107(a)(1)-(2) of CERCLA, 42 U.S.C. § 9607(a)(1)-(2).

71.    LABP was an operator of the Hewitt Pit Landfill, within the meaning of sections 107(a)(1)-(2) of CERCLA, 42 U.S.C. § 9607(a)(1)-(2).

72.    Upon information and belief, CalMat's predecessor, Conrock, owned the Hewitt Pit Landfill property and operated it as a rock quarry from 1923 until the late 1950s.

73.    In 1958, Conrock submitted plans and a proposed map to the Los Angeles Regional Water Quality Control Board ("RWQCB") to develop a landfill at the Hewitt Pit Landfill property.

74.    Conrock leased the Hewitt Pit Landfill property to LABP from approximately 1962 through 1977 pursuant to a written lease agreement dated December 5, 1962.

75.    In June 1963, LABP filed an application with the City of Los Angeles Department of Public Works ("Department of Public Works") for a permit to operate

a fill and cover dump at the Hewitt Pit Landfill property.

76.    In July 1963, the Department of Public Works approved LABP's application and issued LABP a permit to operate the Hewitt Pit Landfill.

77.    LABP operated the Hewitt Pit Landfill from approximately 1963 through 1975, when the Hewitt Pit Landfill was ordered shut down by regulators.

78.    Conrock owned the Hewitt Pit Landfill during the entire period LABP operated the landfill.

**2.    Disposal and Releases of Hazardous Substances**

79.    In the twelve years that Defendants owned and/or operated the Hewitt Pit Landfill as a landfill, the landfill accepted waste that included sources of 1,4-dioxane, TCE, PCE, and other VOCs, including common household products.

80.    The Hewitt Pit Landfill did not have a leachate collection system or surface water run-off controls.

81.    Defendants' activities at the Hewitt Pit Landfill resulted in releases of hazardous substances to the NHOU.

82.    Honeywell has incurred, and will continue to incur, necessary response costs at the NHOU to remediate the hazardous substances released from the Hewitt Pit Landfill during the period of Defendants' ownership and/or operation.

83.    State regulators raised early concerns about the potential for the Hewitt Pit Landfill to impact groundwater.

84.    In 1958, RWQCB imposed Special Conditions on the Hewitt Pit Landfill after analyzing the hydrogeology, high groundwater elevation, and proximity of the site to nearby wells.   RWQCB noted that the Hewitt Pit Landfill property was "comprised of highly permeable alluvial materials, chiefly sands and gravels," and therefore RWQCB cautioned that "extreme care" was required in operating the landfill to prevent groundwater contamination.

85.    In 1962, a representative of the Sanitary Engineering Division of LADWP requested that the Los Angeles Associate Zoning Administrator impose stricter waste

- 13 -
SECOND AMENDED COMPLAINT

disposal requirements on the Hewitt Pit Landfill than were normally required, explaining that there had been a number of instances of water pollution from pits that were thought to be safe, and LADWP had several wells within three-quarters of a mile of the proposed landfill operation.

86.   Although the landfill was only permitted to accept non-hazardous and inert solid wastes, hazardous wastes were in fact disposed of at the Hewitt Pit Landfill, including but not limited to 1,4-dioxane, PCE, TCE, and other VOCs.

87.   In the mid-to-late 1960s, a former manager of the Hewitt Pit Landfill employed by Defendant LABP, Hugh Anderson, was quoted in multiple newspaper articles confirming that the Hewitt Pit Landfill received not only municipal solid waste, but also commercial and industrial waste.

88.   In 1981, the Los Angeles Board of Public Works ("Board of Public Works") conducted an inquiry into whether the Hewitt Pit Landfill contained toxic waste or radioactive debris.  The Board of Public Works found that approximately 5,000,000 tons of "Group 2 and Group 3" wastes were disposed of in the Hewitt Pit Landfill during its operation, including "paints, oils and varnishes as well as drugs and medicines, and partially empty insecticide cans unlawfully discarded by residents."

89.   In 1983, LADWP published a Groundwater Quality Management Plan for the San Fernando Valley Basin.  The Groundwater Quality Management Plan identified the Hewitt Pit Landfill as a possible source of groundwater contamination in the Basin. LADWP observed in the Groundwater Quality Management Plan that "[w]hile most of the landfills investigated were not permitted to receive hazardous waste, it is generally accepted that early regulatory controls on operation and design of landfills were not adequate to prevent the disposal of hazardous waste and the leaching of hazardous chemicals from the landfills into the groundwater."

90.   On information and belief, CalMat allowed LABP to install a diesel underground storage tank on the Hewitt Pit Landfill site in the mid-1960s, which CalMat later removed.  Diesel fuel and lubricating oils were used at the Hewitt Pit

Landfill site.

91. The disposal of hazardous chemicals at the Hewitt Pit Landfill during the period of Defendants' ownership and/or operation, including but not limited to PCE, TCE, and 1,4-dioxane, has resulted in releases or threatened releases of those chemicals that caused and/or contributed to contamination of groundwater and soil at the NHOU.

92. In 1977, LADWP found that the bottom elevation of the Hewitt Pit Landfill was 621 feet above sea level, whereas groundwater in the vicinity of the landfill reached elevations of 646 feet above sea level.   In 1983, the California Waste Management Board found that, based on these figures, "inundation of waste materials would occur, resulting in water quality degradation."

93. At all relevant times (including during the Hewitt Pit Landfill's operation), the direction of regional groundwater flow in the vicinity of the Hewitt Pit Landfill generally has been from the north-northwest to the south-southeast.

94. In April 1987, CalMat submitted a solid waste assessment test ("SWAT") proposal for the Hewitt Pit Landfill to RWQCB, as required by California Water Code § 13273.  CalMat's SWAT proposal indicated that the Hewitt Pit Landfill was leaking waste constituents and might be affecting groundwater in the vicinity.

95. CalMat completed the SWAT in 1989 and submitted a SWAT report to RWQCB on July 1, 1989.  CalMat indicated in the SWAT report that household waste items accepted by LABP at the Hewitt Pit Landfill may have contained hazardous materials.  CalMat conceded that "[b]ecause of the manner and containers in which [household waste] was received, it would have been impossible for [LABP] to reject all of it."

96. RWQCB staff approved the SWAT report in May 1991.  RWQCB's approval letter directed CalMat to sample all groundwater monitoring wells at the site annually and submit monitoring data for various inorganic constituents to RWQCB.

97. On June 25, 1992, CalMat submitted its "1991 Annual Report" for groundwater monitoring at the Hewitt Pit Landfill to RWQCB, which concluded that

- 15 -
SECOND AMENDED COMPLAINT

"landfill gas may be affecting the local groundwater quality."

98. VOCs (including TCE and PCE), 1,4-dioxane, and other hazardous contaminants have been detected in the groundwater monitoring wells near the Hewitt Pit Landfill. In particular, the data show that groundwater extracted from LADWP's Rinaldi-Toluca well field (which is about 500 to 1,000 feet east of the landfill) and from the North Hollywood West well field (which is about 2,000 feet south of the landfill) has been impacted by VOCs and other hazardous contaminants.

99. On November 29, 2012, MWH Americas, Inc., an engineering, consulting, and construction management firm, submitted a technical memorandum to EPA finding that the Hewitt Pit Landfill is a probable, significant cause of the VOC contamination observed in downgradient groundwater at the NHOU.

100. On January 31, 2014, RWQCB issued an order to CalMat to investigate contamination at the Hewitt Pit Landfill.

101. On September 8, 2015, RWQCB issued a Cleanup and Abatement Order to CalMat.

102. On June 1, 2016, CalMat submitted a Site Assessment Report for the Hewitt Pit Landfill site to RWQCB. The Report noted that waste samples collected from landfill monitoring lysimeters indicated the presence of 21 VOCs (including TCE and PCE) and 1,4-dioxane, and samples of native soils indicated the presence of PCE and 1,4-dioxane. The Report further noted that leachate samples from the landfill indicated the presence of 1,4-dioxane and breakdown products of PCE and TCE. Finally, the Report noted that PCE, TCE, and 1,4-dioxane were detected in groundwater samples at levels that exceed California drinking water standards.

103. CalMat subsequently installed additional onsite and offsite monitoring wells to collect samples of groundwater and leachate. Groundwater and leachate samples collected from these wells indicate the presence of PCE, TCE, 1,4-dioxane, and their breakdown products, further confirming that VOCs and other hazardous contaminants emanating from the Hewitt Pit Landfill have impacted and continue to

- 16 -
SECOND AMENDED COMPLAINT

impact groundwater at the NHOU.

**B.      The Penrose Pit Landfill**

104.    The Penrose Pit Landfill is located upgradient of the NHOU at 8301 Tijunga Avenue, Sun Valley, California 91605 (assessor parcel numbers 2311-002-001 and 2311-002-002).

105.    The Penrose Pit Landfill was an unlined municipal solid waste landfill that accepted waste from approximately 1960 to 1985.

106.    The Penrose Pit Landfill was approximately 70 acres in size and was originally a sand and gravel pit operated by CalMat's predecessor, Conrock.

107.    Because hazardous substances were deposited, stored, disposed of, or placed or otherwise came to be located at the Penrose Pit Landfill, the Penrose Pit Landfill is a facility within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

**1.      Source Property Ownership and Operation**

108.    CalMat was an owner and operator of the Penrose Pit Landfill, within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

109.    LABP was an owner and operator of the Penrose Pit Landfill, within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1).

110.    Conrock owned the Penrose Pit Landfill property, within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1), from the 1920s until March 1974.

111.    LABP purchased the Penrose Pit Landfill from Conrock in March 1974 and has been the owner of the Landfill, within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1), from March 1974 until the present.

112.    Conrock leased the Penrose Pit Landfill to LABP from approximately 1960 through March 1974 for the purpose of conducting landfill operations.

113.    On April 28, 1960, LABP submitted a sanitary landfill permit application to the Department of Public Works.

114.    On June 8, 1960, the Department of Public Works issued LABP a permit

- 17 -
SECOND AMENDED COMPLAINT

to operate a fill and cover dump at the Penrose Pit Landfill property, providing that LABP could accept only non-hazardous and inert solid waste.

115. LABP subsequently began accepting waste at the Penrose Pit Landfill on or about September 1, 1960, and continued to accept waste until approximately 1985, when the Penrose Pit Landfill reached its capacity.

116. LABP accepted approximately 17 million cubic yards of refuse at the Penrose Pit Landfill.

**2.      Disposal and Release of Hazardous Substances**

117. Defendants' activities at the Penrose Pit Landfill resulted in releases of hazardous substances to the NHOU.

118. Honeywell has incurred, and will continue to incur, necessary response costs at the NHOU to remediate the hazardous substances released from the Penrose Pit Landfill during the period of Defendants' ownership and/or operation.

119. In September 1971, the City of Los Angeles adopted "The Minimum Regulations for Sanitary Landfills for Combustible, Non Combustible Materials." These regulations provided that LABP, as operator of the Penrose Pit Landfill, could accept residential, commercial, industrial, and demolition waste at the landfill, but expressly prohibited LABP from accepting liquid and hazardous wastes.

120. On June 17, 1977, an article published in the *Los Angeles Times* quoted an employee of the Valley Refuse Collectors Association as stating that the Penrose Pit Landfill was "the only game in town" in terms of operational landfills at that time. The article further noted that the Penrose Pit Landfill received up to 3,500 tons of refuse per day.

121. In January 1979, inspectors from the Hazardous Materials Management Section of the City of Los Angeles Department of Health Services ("LADHS HMMS") performed a routine inspection at the Penrose Pit Landfill. While conducting the inspection, the inspectors "observed a white Chevrolet stake-side truck completing disposal of some fiber drums and miscellaneous cans."

- 18 -
SECOND AMENDED COMPLAINT

122. LADHS HMMS sampled the fiber drums and miscellaneous cans disposed at the Penrose Pit Landfill and determined that the following hazardous chemicals, among others, were disposed of at the landfill: sodium chromate, benzol, and lacquer thinner.

123. LADHS HMMS determined that the individual that illegally dumped the hazardous waste at the Penrose Pit Landfill was Charles Sweet, the owner of a zinc and brass plating industry called Cal-Air Processing.

124. In February 1979, a LADHS HMMS employee visited Cal-Air Processing to obtain more information regarding Cal-Air Processing's illegal disposal of hazardous waste at the Penrose Pit Landfill.

125. According to a memorandum written by the LADHS HMMS employee summarizing his visit to Cal-Air Processing, Cal-Air Processing used cyanide, caustic soda, and a zinc brightener of unknown composition in its processing, and Cal-Air Processing did not subscribe to a commercial dump service. The LADHS HMMS employee noted that "Mr. Sweet expressed complete ignorance of hazardous waste regulations."

126. In a letter dated March 7, 1979 regarding Cal-Air Processing's illegal disposal of hazardous waste at the Penrose Pit Landfill, Harvey F. Collins, Acting Chief of the LADHS HMMS, requested that the LADHS Office of Legal Services "prosecute the operator of the landfill [LABP] for accepting hazardous waste in violation of their (sic) Solid Waste Facilities Permit."

127. LABP was cited by LADHS HMMS for violating its Solid Waste Facilities Permit by allowing Cal-Air Processing to dispose of hazardous waste at the Penrose Pit Landfill.

128. In a letter dated July 13, 1979, Michael L. Kiado, Supervisor of the LADHS HMMS Technical Program, wrote to Jack M. Betz, Director of the LADHS Bureau of Sanitation, regarding additional violations that were observed at the Penrose Pit Landfill. Mr. Kiado's letter attached a draft complaint which contended, among

- 19 -
SECOND AMENDED COMPLAINT

other allegations, that "the Penrose Public Landfill (operated by Los Angeles By-Products Co.) violated Section 17657 of Title 14, California Administrative Code by not posting, at an appropriate point, a sign listing the materials which either would or would not be accepted."

129.   On information and belief, LADHS conducted 17 inspections in 1982 at the Penrose Pit Landfill.  LABP was issued three violations for violating disposal regulations regarding trash, standing water, and improper grading.

130.   On July 1, 1983, LADWP published a Groundwater Quality Management Plan for the San Fernando Valley Basin.  The Groundwater Quality Management Plan identified the Penrose Pit Landfill as a possible source of groundwater contamination in the Basin.

131.   LADWP observed in the Groundwater Quality Management Plan that "[w]hile most of the landfills investigated were not permitted to receive hazardous waste, it is generally accepted that early regulatory controls on operation and design of landfills were not adequate to prevent the disposal of hazardous waste and the leaching of hazardous chemicals from the landfills into the groundwater."

132.   On May 1, 1985, Don Harvey of EPA Region 9 spoke with Mary Osborne of the LADHS HMMS regarding TCE detections found downgradient of the Penrose Pit Landfill.  According to Ms. Osborne's memorandum of the phone call, while groundwater samples taken upgradient of the Penrose Pit Landfill detected TCE at 5 parts per billion ("ppb"), downgradient samples detected TCE at 44 ppb.  Ms. Osborne also reported that these detections of TCE in groundwater led RWQCB to require monthly monitoring of these wells.

133.   On October 29, 1986, the Department of Public Works' Bureau of Sanitation served a Notice of Violation on LABP for insufficient cover in areas at the Penrose Pit Landfill.

134.   In a letter dated December 4, 1986, Delwin A. Biagi, Director of the Department of Public Works' Bureau of Sanitation, wrote to Richard M. Salisbury,

SECOND AMENDED COMPLAINT

President of LABP, regarding the Bureau of Sanitation's investigation of insufficient cover at the Penrose Pit Landfill.  According to Mr. Biagi, as of mid-October 1986, "[A]t least 50% of the [Penrose Pit Landfill's] surface (46 evenly distributed points) has/had less than the required 2 feet of intermediate cover.  Additionally, 15 test locations indicate there is/was only 0.5 feet of existing cover."  Mr. Biagi noted that the insufficient cover at the Penrose Pit Landfill violated the Minimum Regulation for Sanitary Landfills in the City of Los Angeles and LABP's Solid Waste Facilities Permit.

135.  On August 11, 2016, LABP's environmental consultant, AECOM, submitted a report titled "January – June 2016 – Waste Discharge Requirements Monitoring Report" ("2016 Monitoring Report").  The report presented data from sampling at the Penrose Pit Landfill, which indicated the presence of VOCs in groundwater from compliance monitoring well MW-4918B, including: TCE (170 micrograms per liter ("µg/L")); PCE (3.3 µg/L); 1,4-dichilorobenzene (1.3 µg/L); cis-1,2-dichloroethene (17 µg/L); and trichloroethene chlorobenzene (1.4 µg/L).

136.  In a letter dated October 31, 2016, Samuel Unger, RWQCB Executive Officer, ordered LABP to comply with the Release Discovery Response provisions of RWQCB's Monitoring and Reporting Program.  Regarding the detections of VOCs in LABP's 2016 Monitoring Report, Mr. Unger stated, "Since the [detected] VOCs do not naturally exist in groundwater at the Landfill, pursuant to Provision C.2 (Physical Evidence of a Release) of the MRP, the Regional Board Executive Officer has concluded that a release of pollutants to groundwater has occurred."

137.  In a letter dated on November 16, 2016, Paula Rasmussen, RWQCB Assistant Executive Officer, notified Robert McAllister, Chief Executive Officer of LABP, that LABP had violated the California Water Code by: (1) Failing to submit a Post-Closure Maintenance Plan for the Penrose Pit Landfill; (2) Failing to provide source information for inert materials imported to the Penrose Pit Landfill; (3) Failing to report on the effectiveness of groundwater monitoring wells; (4) Failing to provide

- 21 -
SECOND AMENDED COMPLAINT

notification of maintenance activities at the Penrose Pit Landfill; and (5) Failing to properly certify LABP's 2016 Monitoring Report.

### C.    The Tuxford Pit Landfill

138.    The Tuxford Pit Landfill is located upgradient of the NHOU at 11590 Tuxford Street, Sun Valley, California 91352 (assessor parcel numbers 2632-011-010, 2632-011-011, and 2632-011-012).

139.    The Tuxford Pit Landfill was an unlined municipal solid waste landfill that accepted waste between approximately 1948 through approximately 1949 and between approximately 1954 through approximately 1960.

140.    The Tuxford Pit Landfill was approximately 20 acres in size and was originally a gravel mining pit.

141.    Because hazardous substances were deposited, stored, disposed of, or placed or otherwise came to be located at the Tuxford Pit Landfill, the Tuxford Pit Landfill is a facility within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

### 1.    Source Property Ownership and Operation

142.    LABP was the owner and operator of the Tuxford Pit Landfill, within the meaning of section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

143.    LABP owned the Tuxford Pit Landfill property from approximately 1948 to 1967.

144.    LABP operated the Tuxford Pit Landfill from approximately 1948 to 1960, and during that time accepted commercial, residential, and industrial waste.

145.    LABP owned the Tuxford Pit Landfill property during the entire period the landfill operated.

146.    On April 26, 1948, the Board of Public Works issued a revocable permit to LABP to operate the Tuxford Pit Landfill.  This permit was amended on June 14, 1948.  The original and amended permits imposed no restrictions as to the types of waste LABP could accept at the Tuxford Pit Landfill.

- 22 -

147. Upon information and belief, LABP accepted waste at the Tuxford Pit Landfill for approximately 13 months, from 1948 through 1949.

148. From 1949 through approximately 1954, LABP directed waste to the nearby Tujunga Pit Landfill.

149. In October 1954, after the Tujunga Pit Landfill had nearly reached its capacity, LABP filed property plans and dump reports to reactivate the Tuxford Pit Landfill.

150. On December 6, 1954, RWQCB approved LABP's reactivation request for the Tuxford Pit Landfill, on the condition that LABP accept only Class II materials—general combustible refuse and no liquid waste—at 720 feet above sea level.

151. LABP began accepting waste again at the Tuxford Pit Landfill in approximately 1955 and continued accepting waste until the landfill reached its capacity in approximately late 1960.

## 2. Disposal and Release of Hazardous Substances

152. In the twelve years that it operated the Tuxford Pit Landfill, LABP accepted waste that included sources of TCE, PCE, and other VOCs, including common household products such as upholstery and rug cleaners, degreasers, waxes, shoe dyes and polishes, and garden vegetable pesticides.

153. The Tuxford Pit Landfill was located on highly permeable materials.

154. The Tuxford Pit Landfill did not have a leachate collection system or surface water run-off controls.

155. LABP's activities at the Tuxford Pit Landfill resulted in releases of hazardous substances to the NHOU.

156. Honeywell has incurred, and will continue to incur, necessary response costs at the NHOU to address the hazardous substances released from the Tuxford Pit Landfill during the period of LABP's ownership and/or operation.

157. Environmental authorities have long-recognized the Tuxford Pit Landfill

- 23 -
SECOND AMENDED COMPLAINT

as a contributor to groundwater contamination at the NHOU.

158. In November 1954, for example, the Los Angeles Flood Control District ("Flood Control District") expressed serious concerns about the Tuxford Pit Landfill's potential to contaminate regional groundwater before the landfill was reactivated in 1955. Specifically, on November 17, 1954, N.B. Hodkinson, Division Engineer for the Flood Control District, advised the Board of Public Works that "[t]hree water wells [were] located within a mile radius of the site and many others [were] situated southerly and easterly in the direction of ground water movement." Accordingly, because the Tuxford Pit Landfill was "underlain by very permeable alluvial deposits," the Flood Control District recommended that "such precautions as necessary be taken to prevent pollution of this important ground water body."

159. Likewise, the Department of Public Works' Division of Water Resources also expressed serious concerns about the Tuxford Pit Landfill's potential to contaminate regional groundwater. In a communication to RWQCB dated November 9, 1954, Max Bookman, the Engineer in Charge of the Division of Water Resources, recommended that the reactivated Tuxford Pit Landfill be classified as a Class II dump site that could only accept waste at 720 feet above sea level, on the grounds that "the [Tuxford] pit is located in highly permeable materials," and, as a result, it was "possible for percolating liquids in the pit to reach ground waters of San Fernando Valley" that "are used extensively for domestic, agricultural, and industrial purposes."

160. Despite the prohibition against accepting liquid waste at the Tuxford Pit Landfill, on or about September 19, 1955, an inspector from the Department of Public Works observed a rubbish hauler dump a "carton of bottles containing acid" in the Tuxford Pit Landfill.

161. On July 1, 1983, LADWP published a Groundwater Quality Management Plan for the San Fernando Valley Basin. The Groundwater Quality Management Plan identified the Tuxford Pit Landfill as a possible source of groundwater contamination in the Basin.

SECOND AMENDED COMPLAINT

162. LADWP observed in the Groundwater Quality Management Plan that "[w]hile most of the landfills investigated were not permitted to receive hazardous waste, it is generally accepted that early regulatory controls on operation and design of landfills were not adequate to prevent the disposal of hazardous waste and the leaching of hazardous chemicals from the landfills into the groundwater."

### D.   The Strathern Pit Landfill

163. The Strathern Pit Landfill is located upgradient of the NHOU at 11201 Strathern Street, Sun Valley, California 91352.

164. The Strathern Pit Landfill was a municipal solid waste landfill that was operated from approximately 1991 until 2009.

165. The Strathern Pit Landfill was approximately 34.7 acres in size and was originally a gravel mining pit.

166. Because hazardous substances were deposited, stored, disposed of, or placed or otherwise came to be located at the Strathern Pit Landfill, the Strathern Pit Landfill is a facility within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

### 1.   Source Property Ownership and Operation

167. LABP was the owner and operator of the Strathern Pit Landfill, within the meaning of section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

168. LABP owned the Strathern Pit Landfill property from at least 1981 until approximately 2009. LABP owned the Strathern Pit Landfill property during the entire period the landfill operated.

169. On December 4, 1981, LABP submitted an application to RWQCB to operate a solid waste landfill at the Strathern Pit Landfill property. Mr. Richard M. Salisbury, President of LABP, signed the application as both the owner and operator of the facility.

170. On October 1, 1986, LABP submitted a Report of Waste Discharge for the proposed Strathern Pit Landfill to RWQCB.

- 25 -
SECOND AMENDED COMPLAINT

171.    On June 24, 1991, RWQCB issued Waste Discharge Requirements Order No. 91-086 for LABP's operation of the Strathern Pit Landfill.  The Waste Discharge Requirements Order provided that LABP could only accept the following non-water soluble, non-decompostable inert solids: (1) earth, rock, gravel, and concrete; (2) glass; (3) bricks; (4) broken asphalt; and (5) inert aggregate mining waste.  The Waste Discharge Requirements Order prohibited LABP from accepting hazardous waste, liquid wastes, and household and commercial refuse.

172.    LABP operated the Strathern Pit Landfill from approximately 1991 until approximately 2009.

### 2.    Disposal and Release of Hazardous Substances

173.    LABP's activities at the Strathern Pit Landfill resulted in releases of hazardous substances to the NHOU.

174.    Honeywell has incurred, and will continue to incur, necessary response costs at the NHOU to remediate the hazardous substances released from the Strathern Pit Landfill during the period of LABP's ownership and/or operation.

175.    In a letter dated October 5, 1988, Richard Katz, State Assemblyman for California's 39th District, expressed his concern to Paul D. Flowers, Chair of RWQCB, that the disposal of household wastes at the Strathern Pit Landfill could lead to groundwater contamination in the San Fernando Valley Basin.

176.    Mr. Katz cautioned, "By their very nature, gravel pits are located in areas typified by high groundwater tables and proximity to surface and subsurface sources of drinking water.  Past experience with solid waste landfills located in gravel pits in the San Gabriel and San Fernando Valleys demonstrate the high risk they pose to drinking water supplied to millions of people."

177.    On   May 9, 1994, Martin Rosey, an inspector with the City of Los Angeles, conducted an inspection of the Strathern Pit Landfill.  According to the Record of Disposal Site Inspection completed by Mr. Rosey, "No spotter was available on the working face to direct traffic and spot check loads for acceptable material.  A

spotter must be present on the working face while trucks are utilizing the site at all times." Mr. Rosey indicated in the Record of Disposal Site Inspection that LABP's failure to provide a spotter, as required by now-repealed Title 14 California Code of Regulations § 17671, was an "area of concern" for the landfill.

178. On March 29, 1995, an inspection of the Strathern Pit Landfill found that there were three "area of concerns" regarding LABP's operation of the landfill. First, an "area of concern" was noted regarding now-repealed Title 14 California Code of Regulations § 17658 because perimeter fences at the Strathern Pit Landfill were damaged and in need of repair. Second, an "area of concern" was noted regarding now-repealed Title 14 California Code of Regulations § 17708 for "drainage control" because ponding was observed at the Strathern Pit Landfill. Third, an "area of concern" was noted regarding now-repealed Title 14 C.C.R. § 17707 for "vector control" because mosquito larvae were observed in the ponding at the Strathern Pit Landfill.

179. On September 26, 1997, Tania Weaver, an inspector with the City of Los Angeles, conducted an inspection of the Strathern Pit Landfill. According to the Record of Disposal Site Inspection completed by Ms. Weaver, "areas of concern" were noted regarding Title 27 California Code of Regulations §§ 20615 and 20710. Section 20615 provides that an operator must provide "adequate supervision of a sufficient number of qualified personnel to ensure proper operation of the site in compliance with all applicable laws, regulations, permit conditions, and other requirements." Section 20710 governs the scavenging, salvaging, and storage of waste at landfills and disposal sites.

180. TCE and PCE detections as high as 15.1 micrograms per kilogram ("µg/kg") and 44 µg/kg have been detected at Monitoring Well 4928A, a downgradient well located in the southeast corner of the Strathern Pit Landfill.

181. Groundwater data submitted to RWQCB by LABP's consultant, Targhee, Inc., reported that PCE was detected at Monitoring Well 4928C, the Strathern Pit Landfill's upgradient well, during all four quarters of monitoring from the fourth

quarter of 2006 until the third quarter of 2007, and that PCE detections ranged from 7.48 µg/L to 11.9 µg/L.

182.   In a report dated July 6, 2018, the "2018 First Semi-Annual Groundwater Monitoring Report" prepared by the Flood Control District's consultant, TRC, in connection with the Rory M. Shaw Wetlands Park Project associated with the Strathern Pit Landfill property reported that PCE was detected at 11 µg/L at Monitoring Well 4928A, downgradient of the Strathern Pit Landfill property.

## IV.   Procedural Considerations

183.   Honeywell and CalMat entered into a series of tolling and standstill agreements in 2014, pursuant to which the parties agreed to toll claims that are based on, or arise out of, development of the remedial design for the Second Interim Remedy from February 20, 2014 until termination of the operative agreement.

184.   Honeywell gave 30 days' advanced written notice that it was withdrawing from the operative tolling and standstill agreement on February 16, 2023, which notice was received by CalMat on February 24, 2023.  The operative agreement therefore terminated effective March 26, 2023.

185.   Honeywell presented the details of the claims asserted herein to CalMat and LABP in writing on several occasions over the past ten years.  Despite Honeywell's best efforts to resolve these claims out of court, the parties have failed to reach a settlement regarding these claims.

## CLAIMS FOR RELIEF

### COUNT I
**(Cost Recovery Pursuant To CERCLA § 107 Against All Defendants)**

186.   Plaintiff reasserts and incorporates in full all preceding paragraphs by this reference.

187.   CERCLA § 107(a), 42 U.S.C. § 9607(a), imposes strict liability on "(1) the owner and operator of a . . . facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous

substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances. . . , and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities . . . , from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

188. CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), provides that such persons identified in CERCLA §§ 107(a)(1)-(4) are liable for the "necessary costs of response incurred by any . . . person consistent with the national contingency plan," including interest.

189. Plaintiff and Defendants are each a "person" within the meaning of CERCLA §§ 101(21) and 107(a), 42 U.S.C. §§ 9601(21) and 9607(a).

190. The NHOU is a "facility" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

191. The Hewitt Pit Landfill is a "facility" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

192. The Penrose Pit Landfill is a "facility" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

193. The Tuxford Pit Landfill is a "facility" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

194. The Strathern Pit Landfill is a "facility" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

195. CalMat "owned or operated" the Hewitt Pit and Penrose Pit Landfills at the time "hazardous substances" were "disposed of" at those facilities, as those terms are used and defined in CERCLA §§ 101(14), (20), (29), and 107(a)(2), 42 U.S.C. §§ 9601(14), (20), (29), and 9607(a)(2).

196. CalMat was the "owner" and/or "operator" of the Hewitt Pit and Penrose Pit Landfills at the time there were "releases" or "threatened releases" of "hazardous

- 29 -
SECOND AMENDED COMPLAINT

substances" into the "environment" from those facilities, as those terms are used and defined in CERCLA §§ 101(8)-(9), (14), (20), (22), and 107(a), 42 U.S.C. §§ 9601(8)-(9), (14), (20), (22), and 9607(a).

197.   LABP "owned or operated" the Hewitt Pit, Penrose Pit, Tuxford Pit, and Strathern Pit Landfills at the time "hazardous substances" were "disposed of" at those facilities, as those terms are used and defined in CERCLA §§ 101(14), (20), (29), and 107(a)(2), 42 U.S.C. §§ 9601(14), (20), (29), and 9607(a)(2).

198.   LABP was the "owner" and/or "operator" of the Hewitt Pit, Penrose Pit, Tuxford Pit, and Strathern Pit Landfills at the time there were "releases" or "threatened releases" of "hazardous substances" into the "environment" from those facilities, as those terms are used and defined in CERCLA §§ 101(8)-(9), (14), (20), (22), and 107(a), 42 U.S.C. §§ 9601(8)-(9), (14), (20), (22), and 9607(a).

199.   The releases of hazardous substances from the Landfills have caused and/or contributed to contamination of groundwater and soils at the NHOU that have caused the incurrence of response costs.

200.   Honeywell has incurred, and will continue to incur, necessary costs of response consistent with the NCP to construct and operate the Second Interim Remedy for the Central NHOU, including pursuant to the 2018 UAO and First Amendment to the UAO.

201.   Defendants are liable under CERCLA § 107, 42 U.S.C. § 9607, for their equitable shares of the necessary costs of response incurred by Honeywell to construct and operate the Second Interim Remedy for the Central NHOU, to the extent such costs were not subsumed within the 2025 Consent Decree (in which case Plaintiff's claims arise under CERCLA § 113).

## COUNT II
### (Contribution Pursuant To CERCLA § 113 Against All Defendants)

202.   Plaintiff reasserts and incorporates in full all preceding paragraphs by this reference.

SECOND AMENDED COMPLAINT

203.   CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title."  That provision further provides that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."

204.   CERCLA § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), provides that a "person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person . . . ."

205.   As addressed above, Defendants owned and/or operated the Landfills at the time hazardous substances were "disposed" of at those facilities.

206.   Defendants owned and/or operated the Landfills at the time there were "releases" or "threatened releases" of hazardous substances into the environment from those facilities, and those releases have caused and/or contributed to contamination at the NHOU that have caused the incurrence of response costs.

207.   Defendants therefore are liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for the necessary costs of response incurred consistent with the NCP to investigate and remediate environmental contamination at the NHOU.

208.   In the 2020 EPA Past Cost Settlement Agreement, Honeywell resolved its liability to the United States for some of the costs of EPA's response actions in connection with the Second Interim Remedy at the NHOU.

209.   The 2020 EPA Past Cost Settlement Agreement constitutes an administrative settlement within the meaning of CERCLA § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B).

210.   All of the costs Honeywell incurred pursuant to the 2020 EPA Past Cost Settlement Agreement are to reimburse the United States for its necessary costs of response incurred consistent with the NCP under CERCLA § 107(a)(4)(B), 42 U.S.C.

- 31 -
SECOND AMENDED COMPLAINT

§ 9607(a)(4)(B).

211. Defendants were not parties to the 2020 EPA Past Cost Settlement Agreement for recovery of past EPA response costs.

212. In the 2025 Consent Decree, Honeywell resolved its liability to the United States and DTSC for the "Matters Addressed" in the Consent Decree, which include among others the performance of a response action to finance, develop, and implement the Second Interim Remedy in the Central NHOU and monitor the effectiveness of the Second Interim Remedy in the Central NHOU.

213. The 2025 Consent Decree constitutes a judicially-approved settlement within the meaning of CERCLA § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B).

214. All of the costs incurred by Honeywell pursuant to the 2025 Consent Decree constitute necessary costs of response incurred consistent with the NCP under CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B).

215. Defendants were not parties to the 2025 Consent Decree.

216. Defendants have not resolved their liability to the United States for the Second Interim Remedy in an administrative or judicially approved settlement.

217. Defendants are liable to Honeywell under CERCLA § 113 for their equitable shares of the necessary costs of response incurred by Honeywell, consistent with the NCP, with regard to costs incurred pursuant to the 2020 EPA Past Cost Settlement Agreement and the 2025 Consent Decree.

## COUNT III
### (Declaratory Relief Pursuant to CERCLA §§ 107 and 113 and the Declaratory Judgment Act Against All Defendants)

218. CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), provides that for cost recovery actions pursuant to CERCLA § 107, 42 U.S.C. § 9607, where future costs are anticipated, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

219.    The federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

220.    Honeywell will continue to incur response costs to construct, operate, and monitor the Second Interim Remedy and to otherwise remediate environmental contamination at the NHOU, and these costs are recoverable pursuant to CERCLA § 107, 42 U.S.C. § 9607.

221.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will continue to incur, to construct, operate, and monitor the Second Interim Remedy and to otherwise remediate environmental contamination at the NHOU.

222.    Accordingly, pursuant to CERCLA §§ 107(a) and 113(g)(2), 42 U.S.C. § 9607(a) and 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201, Honeywell is entitled to a declaratory judgment that Defendants are liable for their equitable shares of future response costs to construct, operate, and monitor the Second Interim Remedy at the NHOU, which judgment will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT IV
### (Contribution and/or Indemnity Pursuant to Cal. Health & Safety Code §§ 78000 *et seq.* Against All Defendants)

223.    Plaintiff reasserts and incorporates in full all preceding paragraphs by this reference.

224.    Under California Health & Safety Code § 79670, a person who has incurred response or corrective action costs under CERCLA or Health & Safety Code

SECOND AMENDED COMPLAINT

§ 78000 *et seq.* may seek contribution and/or indemnity from any person who is liable pursuant to Part 2 of Division 45 of the Health & Safety Code (§ 78000 *et seq.*).

225. Health & Safety Code § 78145(a)(1) defines "liable person" to mean those persons described in CERCLA § 107(a), 42 U.S.C. § 9607(a).

226. Honeywell has incurred response costs to remediate environmental contamination at the NHOU.

227. Defendants are "liable persons" within the meaning of Health & Safety Code § 78145(a)(1).

228. In light of the foregoing allegations, Defendants are liable under Health & Safety Code §§ 78000 *et seq.* for their equitable shares of necessary response costs incurred and/or to be incurred by Honeywell to construct, operate, and monitor the Second Interim Remedy at the NHOU.

229. Honeywell has provided written notice to the Director of DTSC of its claims for contribution and/or indemnity as alleged herein.

## COUNT V
### (Public Nuisance Against All Defendants)

230. Plaintiff reasserts and incorporates in full all preceding paragraphs by this reference.

231. The contamination and pollution of groundwater and/or soil with VOCs and other hazardous contaminants is a public nuisance as defined in California Civil Code §§ 3479-3480, California Health & Safety Code § 5410, and California Water Code § 13050.

232. Defendants, by acting and failing to act, created and/or failed to prevent the contamination and pollution of groundwater and/or soil at the NHOU.

233. The contamination and pollution of groundwater and/or soil at the NHOU is harmful to health, indecent and offensive to the senses, and an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.

234. The contamination and pollution of groundwater and/or soil at the NHOU

SECOND AMENDED COMPLAINT

has affected a substantial number of people at the same time.

235. An ordinary person would be reasonably annoyed or disturbed by the contamination and pollution of groundwater and/or soil at the NHOU caused by Defendants.

236. The seriousness of the harm created by Defendants outweighs the social utility of Defendants' above-described conduct.

237. The contamination and pollution of groundwater and/or soil caused by Defendants is a public nuisance.

238. The public nuisance created by Defendants is continuing because it is reasonably abatable.

239. Groundwater contamination caused by Defendants continues to migrate, move, and spread onto, into, and across the subsurface and through aquifers, and its impact has thus varied, and continues to vary, over time.

240. Defendants have threatened to, and will continue to, maintain this nuisance by failing to remove and remediate the environmental contamination which has migrated and continued to migrate from Defendants' current and/or former operations and facilities.

241. Agencies including EPA, DTSC, LADWP, and RWQCB continue to engage in efforts to remediate the public nuisance created by Defendants.

242. Unless Defendants are restrained by order of this Court from continuing their non-responsive course of conduct and failure to abate the contamination which has migrated and continues to migrate from its current and/or former operations and facilities, it will be necessary for Plaintiff to commence many successive actions against Defendants to secure compensation for damages sustained, thus requiring a multiplicity of suits.

243. Plaintiff is specially and adversely affected by the public nuisance created by Defendants.

244. Plaintiff has incurred, and continues to incur, costs for constructing and

SECOND AMENDED COMPLAINT

operating the Second Interim Remedy to remediate the public nuisance at the NHOU created by Defendants.  Agencies including EPA, DTSC, LADWP, and RWQCB have required and continue to require Plaintiff to incur these costs.  These costs are consistent with the NCP.

245.  Plaintiff has not consented to and does not consent to this public nuisance caused by Defendants.  Defendants knew and/or should have known that Plaintiff would not consent to this public nuisance.

246.  As a direct and proximate result of the public nuisance caused by Defendants, Plaintiff has been damaged within the past three years and is entitled to the damages alleged herein, or to such other appropriate relief as Plaintiff may elect at trial, including, but not limited to, equitable relief in the form of an order requiring Defendants to abate the nuisance.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Honeywell International Inc. respectfully requests that the Court enter judgment in its favor:

1.    Declaring that Defendants are liable for their equitable share of response, removal, and/or cleanup costs incurred by Honeywell to construct, operate, and monitor the Second Interim Remedy at the NHOU and reimburse the United States for its past response costs pursuant to CERCLA §§ 107 and 113, 42 U.S.C. §§ 9607 and 9613, California Health & Safety Code §§ 78000 *et seq.*, and/or state common law.

2.    Ordering Defendants, pursuant to CERCLA §§ 107 and 113, 42 U.S.C. §§ 9607 and 9613, California Health & Safety Code §§ 78000 *et seq.*, and/or state common law, to pay or contribute their equitable shares of response, removal, and/or cleanup costs incurred or to be incurred by Honeywell with respect to the construction, operation, and monitoring of the Second Interim Remedy at the NHOU and reimbursement of EPA's past costs, including costs, interest, attorneys' fees, and such other relief as the Court may deem appropriate and just.

3.    Declaring that Defendants are liable for their equitable shares of future

- 36 -
SECOND AMENDED COMPLAINT

response, removal, and/or cleanup costs that Honeywell may incur in constructing, operating, and monitoring the Second Interim Remedy at the NHOU, which declaratory judgment will be binding in any subsequent action or actions that Honeywell may bring to recover future response, removal, and/or cleanup costs.

4.    Granting such further relief as the Court deems appropriate and just.

Dated:  February 26, 2025            Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP


By:  /s/ S. Zachary Fayne
      S. Zachary Fayne
      Attorneys for Plaintiff
      HONEYWELL INTERNATIONAL INC.

- 37 -
SECOND AMENDED COMPLAINT